380

Public Utilities Commission,    } No. 4107.
        June 23, 1952.    }

BOSTON AND MAINE RAILROAD *& a. v.* STATE *& a.*

*Orr & Reno* and *Eugene Struckhoff* (*Mr. Struckhoff* orally), for

the petitioners, Boston and Maine Railroad and Boston and Maine Transportation Company. *Robert J. Fletcher* (of Massachusetts), and *John F. Meck* also appeared of counsel.

*Gordon M. Tiffany*, Attorney General, *Henry Dowst, Jr.*, Assistant Attorney General, and *John N. Nassikas*, Assistant Attorney General (*Mr. Nassikas* orally), for the State.

*Kenneth F. Shaw* and *Sheehan, Phinney & Bass* (*Mr. William S. Green* orally), for the town of Newport.

*Jarlath M. Slattery*, for the town of Sunapee.

BLANDIN, J. We believe these cases must be remanded because of errors made by the Commission in calculating the net profit received from the Claremont Branch operations of the petitioning railroad in the years 1949 and 1950. As a result of evidence introduced at the hearings, the Commission decided that the direct freight revenue derived from the branch in the year 1949 was $31,265. By deducting this revenue from the total system freight revenue from the branch of $528,685 for the year 1949, it determined the revenue to the system from shipments to and from points on the branch to be $497,420. The total passenger, mail, express, and newspaper revenue for the branch, including supplemental passenger revenue, the Commission found to be $69,616.80. Adding this to the total system freight revenue from the branch produced a grand total of $598,301.80 for the year. From this grand total the Commission first subtracted the total direct costs of both freight and passenger service on the branch *only* amounting to $167,964.79, leaving a profit of $430,337.01 for the branch operations. The Commission then adopted a second method of reckoning net profit by using what is known as the system average costs formula. By this term is meant cost allocated to the branch according to its mileage, estimated on the average cost on the entire system and comprising such items as locomotive repairs, supplies, the maintenance of tracks and bridges, etc. Applying this plan, the Commission concluded that expenses amounted to $255,587.19. When these were also deducted from the total system revenue, along with the direct costs of $167,964.79, the net profit of the branch operations was reduced to $174,749.82. The report therefore concludes that the net profit of the railroad "derived from this Branch

operation in the year 1949 was between $174,749.82 and $430,337.01, depending upon whether system average costs and actual costs are deducted from the revenue, or only actual costs are deducted." By a similar process, using figures furnished by the railroad for operations during 1950, the Commission found the branch made a net profit of between $132,595.40 and $411,391.13 for that year, depending again on whether system average costs plus actual costs or only actual costs were deducted.

The difficulty with both of these methods is that while they allow for the cost of handling traffic on the branch, they make no allowance for the cost of handling branch traffic on the rest of the system. Obviously, for example, freight being shipped from Boston to Claremont Junction cannot be hauled the seventy odd miles from Boston to Concord for nothing and yet this is the effect of the method of reckoning used here. It is true that no exact figures were presented showing the cost of handling branch traffic on system lines beyond the branch. However, the Interstate Commerce Commission has repeatedly used a formula which allows one-half the total revenue received from freight shipped to and from points on the branch from and to outside places, excluding the direct branch revenue, to be deducted as the reasonable expense of handling such traffic on the system beyond the branch. *Chicago & Northwestern Railway Co. Abandonment*, 230 I. C. C. 645, 653; *Chicago, Milwaukee &c. Railroad Company Abandonment*, 240 I. C. C. 763, 767. The Public Utilities Commission's report states that this is the method of allowance for such expenses employed by the Interstate Commerce Commission and it appears to raise no objection to it. However, it fails to apply it correctly. Had it done so, it would not have credited the branch with the total revenue to and from branch points as $497,420, but only one-half of this figure, or $248,710. In this event the net profit on the branch in 1949 from freight and passenger operations would not be between $174,749.82 and $430,337.01, as stated in the report, but a loss of $73,960.18 or a profit of $181,627.01, depending on whether out-of-pocket costs, so-called, plus system average costs were deducted or only out-of-pocket costs. That these figures are of vital importance in these cases, and that the error concerning them may have affected the result, is too plain to require argument. The report of the Commission, in referring to the table showing profit figures of over $400,000 speaks as follows: "In the figures as portrayed in Table VII lies the doubt of this Commission as to

whether the Claremont Branch is really an out-of-pocket loss to the Railroad, and further doubt as to how much out-of-pocket loss to the Company is in the passenger train operations." While the Commission need not use the formula offered by the railroad in determining the costs which should be deducted from the gross revenue of the branch operations to determine the net profit, yet some allowance should have been made here for this well recognized item of expense. Cherington, The Regulation of Railroad Abandonments (1948), *pp*. 163, 164. As has been said regarding the method to be used in such situations, "The evolution of a workable general formula would be difficult, but scarcely impossible." Cherington, *supra*, 166. It appears to us that whatever method the Commission might decide to use in reckoning this item of expense (*cf. Company* v. *State*, 95 N. H. 353, 360, 361), nevertheless the failure to take into account or to allow any deduction for the substantial cost of handling branch traffic off the branch is an error of law which requires that the orders be set aside. R. L., *c*. 414, *s*. 13. "The public, as well as the parties, is entitled to a finding of the public good on a hearing without error of law." *Parker-Young Co.* v. *State*, 83 N. H. 551, 560.

In regard to the yearly cost of repairs for the engines used on the branch which the railroad claims amounts to some $46,000, the Commission expresses doubt as to the correctness of this figure which the railroad obtained by using the system average method. Actual costs were never furnished although an employee-witness for the railroad testified they could be produced. Though the Commission has itself used this system average method as a means of reaching the cost of repairs on gas engines, for example (*Boston and Maine Railroad,* 21 N. H. P. S. C. 60, 64), yet such matters are peculiarly within the province of the fact finding board and we do not believe it bound to use this method under all the circumstances here. However, it seems obvious that over a period of years engines cannot be run many thousands of miles as testified here at no cost for repairs. We believe if the Commission does not desire to use the method offered by the railroad, and if actual costs are unavailable, it should by means of its specialized knowledge and experience devise some reasonable plan of its own to determine a fair allowance for such repairs. *Cf.* Cherington, The Regulation of Railroad Abandonments (1948), *pp*. 165, 166. It has before it the evidence of the mileage run in passenger service, the type of engine used and other pertinent facts which we expect will enable it to do so.

In indicating that errors in determining net revenues or losses may have affected the orders made, we do not express any opinion whether correction of the errors should or should not produce a different conclusion with respect to discontinuance. The fundamental issue presented by the petitions is whether the expenses which will be eliminated by discontinuance of passenger service have exceeded to such an extent revenues which will be similarly eliminated that the resulting net saving to the railroad will further the public good in greater measure than the loss of passenger service will impair it. This is "in the first instance a question of fact for the commission." *Petition of the N. H. Gas & Electric Co.,* 88 N. H. 50, 58.

In the determination of this issue, calculations of the loss or profit from the freight service are important chiefly as they tend to give significance to the net savings which may be effected by passenger service discontinuance. If the losses presently suffered in passenger operations on the branch are an insignificant portion of similar losses on the system as a whole, and result from rising costs rather than from any substantial change in public need, a finding that discontinuance of passenger service on the branch is not consistent with the public good (R. L., c. 287, s. 23) may still be warranted. On the other hand, different findings with respect to profit or loss may point to a conclusion that continued passenger service is a "wasteful operation" (*Thompson* v. *Railroad,* 86 N. H. 204, 205), the existing public need for which does not justify harm which will result to the State's principal rail transportation system if it is continued. Whether the public good requires further continuance of the service (R. L., c. 289, s. 26) should be determined from the broad standpoint of transportation requirements as a whole, and not solely from the standpoint of adversary proceedings between railroad and users of its passenger service.

One other question which appears likely to arise in the event of future proceedings is whether evidence of the total net revenue of the entire system may be considered in the matter of the discontinuance of the passenger service on this branch. We believe that the weight of authority and the better reasoning favors the admission of such evidence. *Portsmouth Electric Railway,* 7 N. H. P. S. C. 150, 156; Note, 123 A. L. R. 922; *Gardner* v. *Commerce Commission,* 400 Ill. 123. Furthermore, the Commission is not bound by technical rules of evidence. R. L., c. 287, s. 10; *Company* v. *State,* 95 N. H. 353, 362.

386

In view of the conclusion reached, it appears that both the order of the Commission dismissing the petition of the railroad for a discontinuance of the passenger service and the order dismissing the petition for additional authority to operate bus service must be set aside. Accordingly, the cases are remanded for a redetermination of the specific issues herein discussed, and for such revision of the orders as may result therefrom.

*Cases remanded.*

All concurred.