No. 39,670

CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, *Appellant*,
v. STATE CORPORATION COMMISSION OF THE STATE OF KANSAS,
*Appellee.*

(282 P. 2d 405)

Opinion filed April 9, 1955.

*Clayton M. Davis,* of Topeka, argued the cause, and *Mark L. Bennett,* of Topeka, was with him on the briefs for the appellant.

*Jay Kyle,* of Topeka, argued the cause, and *Robert M. Corbett,* of Topeka, was with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: This is an appeal from the judgment of the district court of Republic County considering an order of the State Corporation Commission which denied appellant's application for authority to discontinue the operation of its passenger trains Nos. 25 and 26

between Belleville and Goodland, Kansas, found it to be lawful and reasonable, and rendered judgment sustaining it.

The facts on which the State Corporation Commission made its order are set out in its "Memorandum Opinion" which reads:

"Chicago, Rock Island and Pacific Railroad Company, (Sometimes hereinafter referred to as 'Rock Island,' 'Company,' or 'Railroad Company.') applicant in this proceeding, filed an application on June 19, 1953, requesting authority to discontinue the operation of its Train No. 25 and Train No. 26 between Belleville and Kanorado, Kansas, which trains carry passengers, mail, express, baggage, newspapers, milk and cream for hire.

"A public hearing was scheduled on the application at Phillipsburg, Kansas, on July 30, 1953, but was subsequently continued, and after due notice a public hearing was held on October 8, 1953, at the Phillips County Court House in Phillipsburg.

"Counsel for the cities of Phillipsburg, Goodland, Kanorado, Norton, Clayton, Belleville and Almena, besides the Chambers of Commerce of the following named cities—Goodland, Norton, Lenora, Belleville and Almena, entered appearances in protest to the application and presented some public witnesses. Rock Island appeared by counsel and offered six company witnesses. The Commission and the public generally was represented by the Commission's General Counsel.

"*Present Passenger Service.* Among the Rock Island's many operations in Kansas is one rail line across the state from Kansas City to Kanorado on the Kansas-Colorado line, via Lawrence, Topeka, McFarland, Manhattan, Clay Center and the numerous cities along the line from Belleville to Kanorado; from thence the line continues to Limon, Denver and Colorado Springs, Colorado, with which we are not here concerned.

"The only direct rail connection that the public from Belleville to the Colorado state line has into Manhattan, Clay Center, Topeka, Lawrence, and Kansas City is over the Rock Island. Train No. 25 departs from Belleville at 5:50 a. m. and arrives at Goodland at 12:10 p. m. The east-bound Train No. 26 leaves Goodland at 4:16 a. m. and arrives in Belleville at 12:25 p. m. To continue a trip eastward on the Rock Island, via Clay Center, a passenger is required to lay over in Belleville until 4:30 p. m.—a wait of more than four hours—and catch Train No. 226 which has another layover at McFarland from 7:40 to 8:05 p. m. and then continues eastward on Train No. 44 arriving in Topeka at 9:05 p. m. and Kansas City at 10:35 p. m. On the return trip west, a passenger may board Train No. 43 at Kansas City at 11:30 p. m., reach Topeka at 12:50 a. m. and arrive in McFarland at 2:00 a. m. where there is a 30-minute layover and transfer to Train No. 225. Then he proceeds to Belleville, arriving at 5:30 a. m., where he changes to Train No. 25 and, after a 20-minute wait, proceeds on westward.

"*The Rock Island's Contentions.* The Railroad Company in its application alleges in substance that it is losing substantial sums of money from the operation of these trains and should be permitted to discontinue their operation as it 'will not impair the reasonably efficient and sufficient service to the public.'

"The applicant offered eleven exhibits in evidence attempting to justify

abandonment of these two trains. Without elaborating extensively on them, an examination of Exhibit One (1), assuming that is factually correct, discloses that the trains were operated during 1952 at a loss of $66,284.37. It is important to note, however, that in that year the Company was effecting major economies, one in particular being the dieselization of its motive power. This is a substantial item of direct expense which had declined substantially from previous years, namely 1949, 1950 and 1951. The most significant point respecting Exhibit One (1) is the fact that from January 1, 1953, to June 30, 1953, when its total revenue was exceeded by total expenses in the amount of $51,643.12, two items: one, damage to property of $1,500.00, and the other injuries to persons of $48,561.00; total $50,061.00. These items are not recurring and from the evidence submitted to us at the hearing there was nothing to indicate that such damages had been experienced by the Railroad Company on these two trains in the past. These expenses were the result of an accident on the railroad which the Company arbitrarily charged directly to the operation of these two passenger trains. The resultant factor is that by the elimination of these charges as direct expense to these trains through the liability of the one accident which in no respect is a recurring item in such proportions, the loss for the first six months of 1953 is virtually wiped out, and that statement assumes that all the other figures which the Railroad Company has proffered can be fully substantiated, which is doubtful in some instances.

"An illustration of the probative value of some of the evidence offered by Rock Island was that the revenue from express (Exhibit 1—$26,175.68) for the first six months in 1953 did not include all of the express revenue from these trains but only Rock Island's portion.

"The burden for justification of abandonment of the passenger service falls not upon the public but upon the Railroad Company, and its proof must be positive and without speculation. It is readily demonstrated that by the latest experience of the Railroad Company, any scintilla of proof of confiscation of its property through excessive losses by operation of these passenger trains is lacking.

"One further point should be noted, that in the year 1952 the loss, if any, as presented by the Company in its Exhibit One, would have been materially reduced if its equipment had been dieselized throughout the entire period. There are many elements that enter into the method of the Company's presentation of items pertaining to expenses that must not be resolved through speculation but moreover must be weighed in favor of the public.

"*Deterioration of Service.* The Rock Island is a competitor of the Union Pacific Railroad which railroads parallel each other across the state. Both originate in Kansas City, use the same trackage to Topeka from whence they divide and parallel each other to the Colorado state line, again joining at Limon, Colorado, and thence proceed to Denver, Colorado. The length of the two roads, the entire breadth of the state of Kansas, is approximately the same. That the Union Pacific operates several luxury-type passenger trains on its line from Kansas City to the Colorado state line is common knowledge. The Rock Island does not provide the public with any semblance of such service.

"Traveling from Kansas City to Goodland, Kansas, on the only Rock Island passenger service, requires from 11:30 p. m. to 12:10 p. m. of the following day,

or more than twelve hours to travel a distance of 439 miles. The return trip on Train 26 via Trains 226 and 44 requires the passenger to leave Goodland at 4:16 a. m. and ultimately arrive in Kansas City the same night at 10:35 p. m., which includes layovers at both Belleville and McFarland. Such conditions on the only rail service between Kansas City and the Kansas-Colorado state line over a major railroad, requires exploring in the interest of the public convenience and necessity.

"The present consist of both Trains 25 and 26 includes a baggage car, a combination R. P. O. which has storage space for mail and one conventional air-conditioned passenger coach. In other words, the trains consist of a locomotive and three cars.

"There is also currently the so-called Rocky Mountain Rocket, Trains 7 and 8, that operate from the Kansas-Colorado line to Belleville thence on in to Nebraska, but stops at only a few Kansas cities and most of which are conditional stops.

"In 1940 Trains No. 39 and 40 were through trains operating from Kansas City through Topeka. There was a Rocket train from Kansas City to Denver with every other day service. In other words, a Rocket train went out one day and returned the second. This service was discontinued sometime in 1941 or 1942. This particular company witness was not definite as to why this Rocket service was discontinued from Kansas City to the Kansas-Colorado state line. When that service was withdrawn there was available through passenger service from Kansas City to the Kansas-Colorado state line, although that service too was discontinued on October 1, 1950. Also in that same year the Pullman service from Kansas City, Kansas, to Goodland was discontinued on May 28, 1950. When the Pullman service was discontinued in 1950 there was no public hearing held thereon according to the Company's witness. The train continued but 'Overnight' or 'Pullman Service' was discontinued after May 28, 1950. Subsequent to October 1, 1950, the Company again changed service by requiring a change of trains at Belleville. This same train after it left Limon, Colorado, became a mixed train. The Company maintained the daylight run service for a short period of 1950 and then made a general rearrangement of its passenger schedule from Kansas City, Kansas, to the Kansas-Colorado line. The Company instituted service that provided for departure from Kansas City at 11:20 p. m. and arrival in Goodland the next day at noon, which required changes at McFarland and Belleville. On a return trip from Goodland to Kansas City passengers left Goodland at 5:05 a. m. and arrived at Kansas City at 9:50 p. m. with changes at both Belleville and McFarland. The return trip from Goodland to Kansas City required a layover in Belleville of fifty minutes and a two hour and twenty-five minute wait at McFarland.

"Going on Train 25 in 1950 the layover in McFarland was twenty-five minutes and in Belleville twenty minutes. The witness who was the general passenger agent for Rock Island conceded that 'it is an inconvenience to the public to have changes and layovers at McFarland, Kansas.' The witness would not concede that when the railroad made a change from through service to two stopover periods, requiring a change in trains, that it was deterioration in service. He said 'He did not like the word deterioration.'

"The type of coach now being used on Trains 25 and 26 is the class 2900 which was acquired in either 1924 or 1925.

"This Company witness testified that the Rocket that formerly operated from Kansas City to Denver worked very nicely in one direction but in the opposite direction did not haul any people. There was no layover in Belleville. If Trains 25 and 26 were discontinued, a passenger to get to Kansas City by rail from west of Belleville would have to go to Lincoln, Nebraska, and catch a train on another line to Kansas City. The Company has taken no affirmative steps to obtain passenger business in the past ten years except to try to hold on to what they had. Advertising will not do any good there.

"On redirect examination this witness testified that the former Rocket service did fairly well westbound but was not so good eastbound because of the 'unearthly hours' of arrival in Kansas City. There were two reasons for the decline of service: 'one was the declining use of the service eastbound and this is necessarily from memory, using some of that equipment on the Texas Rocket which was hauling a lot of military to Texas.' On cross examination he again testified that the Rocket was needed for the Texas Rocket during World War II and the service was never restored after the war.

"One witness testified that the present coaches that are being used on Trains 25 and 26 are supposed to be given a thorough cleaning at Council Bluffs (Iowa) and swept out at Limon (Colorado). Public witnesses testified that the coaches were not clean.

"One public witness testified that service was terrible. This particular witness was a businessman in one of the cities served by Rock Island but had not been solicited lately for passenger service or express. He testified that he would use the passenger service to Topeka if he had convenient schedules. The transcript, consisting of 216 pages, includes the testimony of other witnesses on behalf of both Rock Island and the public. We have carefully reviewed all of this testimony and have considered it in our final determination. However, we deem it not necessary to set out the résumé of the testimony of these other witnesses here.

"The application requested authority to discontinue Trains 25 and 26 between Belleville and Kanorado. We informally authorized Rock Island to discontinue operation of these trains from Kanorado to Goodland, a distance of 18 miles, on November 8, 1953, primarily because of the lack of terminal facilities at Kanorado and the availability of such facilities at Goodland. We are convinced that the public convenience and necessity does not require the operation of these trains this short distance in an area that is sparsely populated."

### "Conclusion

"In determining whether a railroad company should be permitted to abandon passenger service there are certain elements and factors that must be taken into consideration. The public convenience and necessity is paramount; second, whether the operating losses of the particular service would result in an unreasonable and an unlawful burden upon the applicant; third, the availability or inadequacy of the service to be substituted.

"We have reached the conclusion that the Company is not currently sustaining substantial financial operating losses but, moreover, its financial operations

have been strengthened by the practice of strict economies. We had demonstrated to us that the Company's service has deteriorated in recent years, but we feel that the public convenience and necessity would be impaired if we permitted the abandonment of Trains 25 and 26 between Goodland and Belleville.

"There is not at the present time the assurance of an adequate and dependable substitute for the rail service now available to passengers, mail, newspapers, express, baggage, milk and cream. While passenger service would be discontinued only from Belleville to Goodland it would work a definite hardship, despite the current poor service, on the public seeking to travel east of Belleville by rail to Topeka, Kansas City and other cities on this cross-state rail line and return beyond Belleville to the cities westward.

"Finally, as the public interest is ultimate, we find that it would be a hardship and a detriment to the public convenience and necessity if the Railroad Company was permitted to abandon Trains 25 and 26; that this service should continue, if not improved and increased, in the public interest, welfare, convenience and necessity.

"An appropriate order in conformance with the views heretofore expressed will be entered in this docket as of this date. This memorandum opinion is hereby incorporated and made a part of said order."

The State Corporation Commission made an order in harmony with its Memorandum Opinion which was incorporated in the order by reference, which, after dealing with formal matters not here important, included the following:

"That the evidence adduced reflects minor financial losses from the operation of said trains, such losses, if any, do not now result in an unreasonable and an unlawful burden upon the applicant.

"That by the abandonment of these trains the public will be burdened with undue hardship and be inconvenienced thereby.

"That the public convenience and necessity requires the continuation of the operation of these two trains."

and denied the application of the Railroad Company to discontinue its trains Nos. 25 and 26 between Belleville and Goodland.

In due time the Railroad Company filed its application for rehearing which was duly considered by the State Corporation Commission and denied. In due time thereafter the Railroad Company filed in the district court of Republic County its application for review of the order of the State Corporation Commission whereupon the court made an order specifying the time for the parties to file abstract of record, counter abstract and briefs, and set the cause for hearing on May 20, 1954, at which time the matter was orally argued and presented to the court. With the court's permission the Railroad Company filed requested findings of fact and

conclusions of law. On June 25, 1954, the court entered its judgment, which reads:

"The above entitled matter was, on the 20th day of May, 1954, submitted to the Court sitting at Concordia, Kansas. The Court requested briefs and took the matter under advisement.

"The Court has carefully considered the Transcript of Proceedings had before the Corporation Commission of Kansas at Phillipsburg, Kansas on October 8, 1953, and certified copies of instruments relating thereto; also Abstract of Record, Counter Abstract of Record, and briefs filed by the parties.

"The Court finds the order entered by the Corporation Commission of the State of Kansas on the 16th day of December, 1953, denying the application of applicant to discontinue Trains No. 25 and No. 26 between Belleville, Kansas and Goodland, Kansas, to be lawful and reasonable and that judgment should be entered sustaining said order.

"It Is Therefore by the Court Considered, Ordered, Adjudged and Decreed, the order of the Corporation Commission of Kansas, entered on the 16th day of December, 1953, is lawful and reasonable. Judgment is hereby entered sustaining said order."

Counsel for appellant present three questions for our determination. They say (1) the supreme court can and should determine from the record what the evidence established and exercise its own judgment whether or not applicant should be authorized to discontinue its trains 25 and 26.

In support of this contention they cite *Mathewson v. Campbell*, 91 Kan. 625, 138 Pac. 637. That case involved an election contest which depended primarily upon the validity of ballots. The ballots had been introduced in evidence as a part of the record. The problem consisted of examining the ballots to see whether they conformed to the statute. This court held it could do that as well as the trial court. The case here is not so simple, as can be seen readily from the Memorandum Opinion of the Corporation Commission. When the case was taken to the district court for review the function of the district court was to determine whether the order of the Corporation Commission was lawful and reasonable. In doing so it was necessary for the district court to review the evidence. See *Union Pac. Rld. Co. v. State Corporation Commission*, 165 Kan. 368, 194 P. 2d 939; and, *City of McPherson v. State Corporation Commission*, 174 Kan. 407, 257 P. 2d 123. In those cases the court ruled that in the exercise of that function the district court was required to weigh the evidence, review the entire record and base its decision upon all the facts and circumstances to be gleaned therefrom. Normally, this court is an appellate court

and the only real question before us is whether the trial court erred in finding that the decision of the Corporation Commission was lawful and reasonable. In a number of cases which come before this court on written or documentary evidence or upon an agreed statement of facts, this court has decided for itself what the facts established. When confined within reasonable bounds it promotes the administration of justice, but if pushed too far it performs the functions of the trial court. This case was not submitted to the Corporation Commission upon an agreed statement of facts, nor upon purely documentary evidence, so the rule is not applicable here. In a case where there has been oral testimony and exhibits, the accuracy of which was questioned, this court has no authority to decide the issues *de novo*.

Counsel for appellant next present the proposition (2) "There is no public necessity for the operation of applicant's trains 25 and 26." This is largely a question of fact decided adversely to appellant by the Corporation Commission and necessarily affirmed by the district court. We cannot say as a matter of law that the question was wrongly decided. This is not a branch line. It is a part of the main line of appellant. Appellant has a good train, the Chicago to Denver Rocket through Omaha to Belleville and west to Denver, but it stops at only three of the county seats and has flag stops at four other places. Many people in traveling from northwest Kansas to Topeka, our seat of government, Lawrence where the University is located, and Kansas City where many of them need to go on business or for other purposes are dependent upon this line of the Rock Island, or are compelled to travel to some point where they can get adequate train service on the Union Pacific. Appellant's shortage of passenger service on its own line in that territory has deteriorated to such an extent that people use it only as a necessity. A layover of four hours in Belleville and 20 or 30 minutes at McFarland and the change of trains in the nighttime are not conducive to desirable travel.

The next question (3) presented by appellant for our determination is stated thusly: "The operation of trains 25 and 26 places an undue financial burden upon applicant; and the refusal of the Commission to authorize discontinuance is unreasonable, arbitrary and unlawful, depriving applicant of its property without due process of law." On behalf of appellee it is contended that the evidence produced by appellant before the Corporation Commis-

sion was not very helpful in determining this question; that while the expense of operating the trains was computed over a period of four and a half years the number of passengers using the trains was computed over a period of only 124 days, from May 14 to September 14, 1953. Also, it was pointed out that the first six months of 1953 included expenses of a personal injury claim and property damage of slightly more than $50,000, which was not a recurring item. There was no evidence that a similar item had ever occurred before or any real likelihood that it would occur in the future. Also in the year 1952 when appellant's figures showed a substantial loss was when it was dieselizing its motive power. While this was a proper operation it was an extraordinary one. It is pointed out that Mr. Wells, appellant's Assistant General Manager, testified that the appellant railroad's total operation was making money and that this division in its over-all operation was making money; that he did not know whether the mileage from Belleville to the Colorado line was making or losing money on its over-all operation. He was of the opinion that the passenger department, Rock Island or any other railroad, is not operating at a profit when the appropriate charges are made against the passenger service. It was also shown that, that is a fact taken into consideration in fixing rates for freight and other railroad services. We have examined the cases cited by respective counsel and considered their arguments on this point and we cannot say as a matter of law that the showing made in this case establishes the fact that the refusal of the Corporation Commission to authorize a discontinuance of these two trains results in depriving appellant of its property without due process of law.

From what we have said it is clear that the judgment of the trial court should be affirmed. It is so ordered.