No. 40,837

THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a corporation, *Appellee*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellant*.

(322 P. 2d 715)

Opinion filed March 8, 1958.

*J. Robert Wilson,* of Topeka, argued the cause, and *Clyde E. Milligan, Joyce R. Tyler* and *Harold E. Jones,* all of Topeka, were with him on the briefs for appellant.

*J. B. Reeves,* of Topeka, argued the cause, and *C. J. Putt, W. E. Treadway* and *Edwin M. Wheeler,* all of Topeka, were with him on the briefs for appellee.

*J. W. Lowry,* of Atchison, for the City of Atchison and the Chamber of Commerce of Atchison, as *amici curiae.*

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal from a judgment of the district court of Shawnee County in which it found the order of the State Corporation Commission denying the application of The Atchison, Topeka and Santa Fe Railway Company to discontinue trains 55 and 56 between Atchison, Kansas, and Topeka, Kansas, to be unlawful and unreasonable.

For convenience and in the interest of brevity the State Corporation Commission, appellant, will be referred to as the Commission, and the railway company, appellee, as the Company throughout the course of portions of this opinion.

The trial court's findings of fact are more than ample to present the factual situation, and are as follows:

### "FINDINGS OF FACT

"1. On April 12, 1955, The Atchison, Topeka and Santa Fe Railway Company made application to the State Corporation Commission of the State of Kansas for authority to discontinue the operations of Motor Trains Numbered 55 and 56 between Atchison and Topeka, Kansas; and in lieu thereof to provide for the transportation of milk and cream, baggage and express by means of The Santa Fe Trail Transportation Company, a motor common carrier, duly authorized to engage in intrastate and interstate commerce between the points involved in this application. This application was heard by the Commission on September 2, 1955, and was denied by order dated February 22, 1956, and served on March 1, 1956. Application for rehearing was seasonably filed pursuant to Section 66-118b, G. S. Kansas 1949, and was denied

by order of the Commission. Application for review was seasonably filed pursuant to the provisions of Section 66-118c, G. S. Kansas 1949. A certified transcript of all pleadings, applications, proceedings, orders and of the evidence heard by the Commission has been filed with the Court, and by order of the Court abstract and briefs were filed by the respective parties and the cause was heard by the Court on December 27, 1956.

"2. The substance of the Commission's order was that the applicant is under an absolute duty by virtue of its franchise and charter to continue passenger service between Atchison and Topeka, and that this delegation can be avoided only by a showing of an undue burden or loss upon the entire system; that the only passenger service being rendered is that afforded by these trains, and there has been no showing that the operation of these trains constitutes an appreciable loss to the branch line or to the entire system.

"The substance of the applicant's petition for review is that the Commission's order is unlawful and unreasonable. That public convenience and necessity do not require the continued operation of Motor Trains 55 and 56; that the evidence does not sustain the findings or the order of the Commission; that its system revenues in this type of proceeding are immaterial; that its revenues and expenses in the operation of this motor train were prepared in accordance with the accounting rules and procedures prescribed by the Interstate Commerce Commission, which cannot be lawfully varied by the Kansas Commission; and that the order constitutes an arbitrary and unreasonable confiscation of private property, and constitutes an unauthorized burden upon interstate commerce.

"3. All Class I Railways have suffered severe passenger operating deficits for several years. In 1954 the passenger operating deficit on the Santa Fe System reached $46,327,309; and a deficit of $6,321,548 within the State of Kansas. In 1916, the year used by the Interstate Commerce Commission for comparison purposes as the last year preceding competitive modes of passenger transportation, 97.98% of intercity travel was by railway, whereas in 1953 only 5.5% of intercity passenger travel was by railway. Between 1939 and 1954 hourly wages paid to Santa Fe employees have increased 170%, material prices have increased 139%, but revenues per passenger mile have increased only 25%.

"4. Motor Trains 55 and 56 operate daily, except Sunday, on a branch line between Atchison and Topeka serving the intermediate points of Parnell (blind siding), Hawthorne (blind siding) and Cummings (pop. 50) in Atchison County; Nortonville (pop. 615), Valley Falls (pop. 1150), Rock Creek (pop. 91), Meriden (pop. 421) in Jefferson County; and North Topeka (blind siding) and Topeka in Shawnee County. Automobile registration figures for 1954 show that in Atchison and Jefferson Counties there are 3.0 persons per auto, and in Shawnee County 2.6 persons per auto. Since 1930 the population of Atchison County has decreased over 20% and that of Jefferson County has decreased over 15%. Both Atchison and Topeka are served by several rail and bus lines. Cummings and Nortonville are served by a bus line on Sundays and holidays only, whereas Valley Falls is served daily by Continental Bus Lines. Common carrier truck lines interlace this area, serving all points in interstate as well as intrastate commerce.

"5. The equipment operated as Motor Trains 55-56 is a one-unit motor car that has a total seating capacity of 43, divided into a smoking compartment seating 16 and a chair car section with 20 reclining seats and 7 nonreclining seats. There is a rest room at each end of the car, and a baggage and express compartment at the forward end. In January of 1952 the motor train was completely rehabilitated inside and out, the seats were reupholstered, and the power plant was converted from gas electric to diesel at a total expenditure of about $23,000, resulting in increased economy of operation. The train is operated by a three-man crew—an engineer, a conductor and a baggage-brakeman.

"6. The greatest use of Motor Trains 55-56 in a five year and seven month period covered by Exhibit 8, detailing the passenger use of this train by months, occurred in December, 1952, when there was an average of 11.2 passengers per train mile. In 1953, the passengers per train mile reached a high of 9.7 and a low of 5.7. In 1954 there was a high of 6.6 passengers per train mile and a low of 4.2. The first seven months of 1955 show a high of 5.9 passengers per train mile and a low of 4.5. The monthly average number of passengers in a five year and seven month period utilizing these trains during the course of a one-way trip has never been more than 18 and has been as few as 4.

"7. Prior to January 27, 1954, Motor Trains 55-56 operated on a schedule between St. Joseph, Missouri, and Topeka, Kansas, with a turn-around at Topeka, leaving St. Joseph in the morning, arriving at Topeka in the forenoon, with an afternoon run back to St. Joseph. This schedule was mail impelled, and did not afford connection with Santa Fe's transcontinental trains at Topeka. Mail was discontinued on this train by unilateral action of the Post Office Department by order dated August 7, 1953. Application was filed with the State of Missouri on October 16, 1953, to discontinue service between St. Joseph, Missouri, and the Kansas-Missouri State Line, which was granted effective January 27, 1954. Accordingly, on January 27, 1954, the schedule of Motor Trains 55-56 was reversed so as to make connections with Santa Fe's transcontinental trains at Topeka, with the hope that this would build up passenger business.

"8. Regardless of schedule Motor Trains 55-56 have failed to provide sufficient common carrier revenues to meet even the pay roll of the train crews. In 1950 total common carrier revenues were $9,545 and total wages of the train crew were $10,125; in 1951 such revenues were $7,327 and such wages were $8,808; in 1952 such revenues were $10,381 and such wages were $12,154; in 1953 such revenues were $9,516 and such wages were $12,014; in 1954 such revenues were $7,267 and such wages were $14,438; and for the first seven months of 1955 such revenues were $4,473 and such wages were $8,381.

"9. Out-of-pocket loss on Motor Trains 55-56, excluding mail revenues, were $21,233 in 1950; $19,687 in 1951; $22,189 in 1952; $22,513 in 1953; $29,455 in 1954; and $18,059 in the first seven months of 1955. Including mail revenues, such out-of-pocket losses were $14,439 in 1950; $11,949 in 1951; $12,204 in 1952; $16,515 in 1953; $29,455 in 1954; and $18,059 in the first seven months of 1955. Such out-of-pocket losses represent direct savings by the discontinuance of this train and do not include any of the fully allocated

cost items such as station costs, overhead costs, signal maintenance, right of way maintenance, depreciation, supervision, claim costs, costs of equipment modification, or proration of federal, state and local taxes.

"Total out-of-pocket expenses were $30,778 in 1950; $27,014 in 1951; $32,-570 in 1952; $32,029 in 1953; $36,722 in 1954; and $22,532 in the first seven months of 1955. In 1950 total revenues were $16,339, of which $6,794 were mail revenues; in 1951 total revenues were $15,065 of which $7,738 were mail revenues; in 1952 total revenues were $20,366 of which $9,985 were mail revenues; in 1953 total revenues were $15,514 of which $5,998 were mail revenues; in 1954 total revenues were $7,267 (no mail revenues); and in the first seven months of 1955 total revenues were $4,473 (no mail revenues).

"10. Public witnesses in protest to this application were 11 ladies from Meriden, Kansas, and the Mayor, City Manager and Manager of the Chamber of Commerce at Atchison, Kansas. Meriden is approximately 15 miles north of Topeka. The witnesses from Meriden claimed they could not and did not use Motor Trains 55-56 after the schedule change of January 27, 1954, for the reason that such a schedule would not afford a round trip to Topeka and back to Meriden on the same day. Atchison witnesses made the same complaint, but the record shows no substantial difference in the use of this train at Atchison between the two schedules.

"11. Operations of this train on a Topeka turn-around would increase operating costs by approximately $2,000 a month, thus almost doubling the annual losses sustained in the operation of this train. Such increased costs are occasioned by the fact that on a reverse schedule the engineer would have to be paid three hours a day overtime, the conductor and the baggage-brakeman two hours a day overtime, and it would be necessary for the Santa Fe either to build complete facilities at Atchison (there being none there now) for the necessary maintenance of this train, or to enter into a contract with the Missouri Pacific Railroad Company to perform such maintenance with their facilities. Assuming that the Missouri Pacific Railroad Company would agree to such a contract, it would cost approximately $2,000 a month. The cost of building facilities and of maintaining personnel for the maintenance of this train would be considerably in excess of that figure.

"12. The application by its terms provides that upon discontinuance of Motor Trains 55-56, all head-end traffic (express, baggage, milk and cream) will be transported by The Santa Fe Trail Transportation Company, a motor carrier, duly authorized to engage in interstate and intrastate commerce between the points involved in this application, a wholly owned subsidiary of this applicant. No milk and cream has been transported on Motor Trains 55-56 since 1950. Baggage has been very nominal. The Railway Express Agency, Inc., is a common carrier duly authorized to engage in the transportation of express in interstate and intrastate commerce. Its traffic can be adequately transported by The Santa Fe Trail Transportation Company. No objection from any witness is contained in this record to this proposed handling of head-end traffic.

"13. The record fails to show any public convenience and necessity that would require applicant to continue the operation of Motor Trains 55-56 at out-of-pocket losses in excess of $25,000 per year."

As conclusions of law the court held:

"CONCLUSIONS OF LAW

"1. The weight of the evidence in this hearing does not support the finding of the Commission that public convenience and necessity require the continued operation of Motor Trains 55 and 56 for the transportation of passengers, baggage, express, milk and cream.

"2. The proposed substituted service by The Santa Fe Trail Transportation Company will provide such service as public convenience and necessity require to the points here involved in the transportation of baggage, express, milk and cream.

"3. The reasons which originally may have provided justification for compulsory facilities maintained at substantial losses have largely disappeared today, rendering local branch line train service, in many cases, an obsolete form of transportation. Recognition of such factors by regulatory bodies not only results in financial benefits to railroads, but, by eliminating unnecessary passenger train service, makes more economical transportation for the public on the trains which remain in substantial demand. In the light of such changed conditions, it is a duty of the carrier to seek, and of the regulatory agencies to permit, elimination of an uneconomic service no longer needed or used by the public to any substantial extent.

"4. Passenger trains are operated primarily for the carriage of passengers, and if the public abandons the trains for passenger travel, there is no duty or obligation to continue their operation at a substantial loss; and in a proceeding to discontinue such trains, the revenue, expenses and losses shown in the operation of a train have a direct bearing upon whether or not public convenience and necessity require the continued operation of any particular train.

"5. The State of Kansas may not, through the agency of the State Corporation Commission, require common carriers by railroad to maintain services available to the general public regardless of the cost of operations and regardless of the meager use of those services, even though discontinuance of such services would result in inconvenience to a few. To do so would amount to confiscation.

"6. Under the provisions of 49 U. S. C. A. Section 20(3), *et seq.*, and the rules set forth in the federal register, 49 C. F. R. Sections 10.01 to 10.825 inclusive, 12 F. R. 4452, *et seq.*, all of the accounting and auditing procedures of this applicant are specified by the Interstate Commerce Commission. Under the provisions of 49 U. S. C. A. Section 20(5) it is unlawful for applicant to keep any accounts, records, and memoranda contrary to any rules, regulations or orders of the Interstate Commerce Commission.

"7. Authority to discontinue unprofitable passenger train service may not be denied on the sole ground that the railroad's system-wide operations are sufficiently profitable to absorb losses on that service. A railroad company cannot be required to continue an unneeded and unused passenger service until its revenues from all sources have deteriorated to the point of insolvency.

"8. After a careful examination of the entire record, including all the evidence, the Court finds that the Commission's order denying the applicant

permission to discontinue Motor Trains 55 and 56 was not supported by substantial evidence reasonably tending to sustain the order.

"9. The order of the Commission is unlawful and unreasonable."

The trial court entered judgment in harmony with the conclusions of law and reversed the order of the Commission dated February 22, 1956, with directions to enter an order granting the application on the terms sought by the Company.

The Commission in its brief raises three questions:

"1. Should the District Court determine from the record what the evidence established and exercise its own judgment in deciding whether or not the Santa Fe should be authorized to discontinue trains 55 and 56?

"2. Is there public necessity for the operation of Santa Fe's trains 55 and 56?

"3. Does the operation of trains 55 and 56 place an undue financial burden upon the Santa Fe or does the refusal of the Commission to authorize discontinuance deprive the Santa Fe of its property without due process of law?"

Answer to the foregoing questions necessitates reference to certain provisions of the statute prescribing the duties and authority of the district court upon the trial of appeals from orders of the Commission reviewing applications of common carriers to discontinue or make changes in existing train service. The pertinent portions read:

". . . Said proceedings for review shall be for the purpose of having the lawfulness or reasonableness of the original order or decision or the order or decision on rehearing inquired into and determined, and the district court hearing said cause shall have the power to vacate or set aside such order or decision on the ground that such order or decision is unlawful or unreasonable . . . The procedure upon the trial of such proceedings in the district court and upon appeal to the supreme court of this state shall be the same as in other civil actions, except as herein provided. No court of this state shall have power to set aside, modify or vacate any order or decision of the commission, except as herein provided." (G. S. 1949, 66-118d.)

"No new or additional evidence may be introduced upon the trial or any proceedings for review under the provisions of this act, but the cause shall be heard upon the questions of fact and law presented by the evidence and exhibits introduced before the commission and certified by it: . . ." (G. S. 1949, 66-118f.)

"If the court upon such hearing shall find such order of the commission under review to be lawful and reasonable, it shall render judgment sustaining said order, . . ." (G. S. 1949, 66-118j.)

"If the court shall find that the order or decision of the state corporation commission is unlawful or unreasonable in whole or in part and shall vacate or set aside the order or decision in whole or in part, the court shall make findings of fact and conclusions of law, . . ." (G. S. 1949, 66-118k.)

The foregoing sections of the statute make it clear that on review of an order of the Commission involving changes in rates and service the district court in which the proceeding is pending (1) has power to vacate or set aside the order on the ground it is unlawful or unreasonable; (2) is required, upon trial of such a proceeding, to hear the cause upon the questions of fact and law presented by the entire record as certified by the Commission; and (3) is directed and required to find the order under review is either (*a*) lawful and reasonable, or (*b*) unlawful or unreasonable. (*Union Pac. Rld. Co. v. State Corporation Commission,* 165 Kan. 368, 194 P. 2d 939.) For a discussion of the terms "unlawful" and "unreasonable" see *Southern Kansas Stage Lines Co. v. Public Service Comm.,* 135 Kan. 657, 11 P. 2d 985.

In a case of this type it has been said that the court is not dealing with a purely administrative order of the Commission but one which is judicial in character. (*Union Pac. Rld. Co. v. State Corporation Commission,* supra.) But in *Rock Island Motor Transit Co. v. State Corporation Comm.,* 169 Kan. 487, 493, 219 P. 2d 405, the court did not consider it material or necessary to attempt any finespun distinction between so-called administrative orders and those of a judicial nature. It was more concerned with the scope of review of the district court.

We shall now direct our attention to the Commission's first question. In *Rock Island Motor Transit Co. v. State Corporation Comm.,* supra, this court said:

"But touching briefly on the authority of the district court to 'weigh' the evidence, we fail to see how the court could intelligently determine the lawfulness or reasonableness of the Commission's order without a careful study and review of the evidence, and this necessarily includes not only its right but also its duty to weigh the evidence . . .

. . . . . . . . . . . . .

"How else could a court intelligently determine the lawfulness or reasonableness of the Commission's order? To hold otherwise would, from a practical standpoint, result in the emasculation of the statutory mandate giving the district court power to determine the lawfulness and reasonableness of an order of the Commission. . . ." (p. 494.)

In *Union Pac. Rld. Co. v. State Corporation Commission,* supra, this court held that the function of a district court in proceedings for review of an order made by the Commission is limited to the inquiry whether the order made is lawful or reasonable and that in the exercise of that function the court is required to weigh the evidence, review the entire record and base its decision upon all

the facts and circumstances contained therein. In doing so it must weigh the evidence solely for the purpose of determining whether such order is reasonable, and only when the district court finds the order of the Commission to be unlawful or unreasonable is it authorized to vacate or set aside the order. Upon doing so, however, the district court is obligated under the statute to make findings of fact and conclusions of law. (G. S. 1949, 66-118k.)

The foregoing cases are cited with approval and followed in *Chicago, R. I. & P. Rly. Co. v. State Corporation Commission,* 177 Kan. 697, 282 P. 2d 405, where this court considered the identical questions raised by the Commission in the instant appeal.

It may be said that an order of the Commission is unreasonable if under all the circumstances it is unfair, unwise and unjust. This question must be determined by the trier of the facts. It is only when such determination by the trier of the facts finds the order so wide of the mark as to be outside the realm of fair debate that the courts may nullify it. The same regard should be given to the informed conclusions of fact made by the Commission. (See, *Southern Kansas Stage Lines Co. v. Public Service Comm.,* supra.)

The Commission contends that the trial court misconstrued its function under the law of the foregoing cases and makes reference to Conclusion of Law No. 1. We do not agree. Finding of Fact No. 13 and Conclusions of Law Nos. 8 and 9 must be construed with it and they clearly indicate that the trial court understood its function.

The district court's findings of fact, though more extended, differ from those of the Commission in only a few respects. In the Commission's order it takes the number of one-way trips made by revenue passengers over a period of five years and seven months, which are basic facts in evidence, and arrives at the conclusion that 40,721 passengers, the equivalent of 45% of the population of Atchison and seven other towns, use this branch line train, which is less than 50 miles in length. This is absurd. The trial court found that the passengers per train mile using trains 55 and 56 were at an average high per month in 1955 of 5.9 and a low of 4.5. This finding is based squarely upon the evidence.

The Company argues that the Commission's order could only have been sustained had the district court held as a matter of law that passenger use of these trains, as aforesaid, requires the railway company to continue the operation of these trains at an out-of-.

pocket loss that amounted to $29,455 in 1954 and $18,059 in the first seven months of 1955.

This raises another question in which the Commission differed from the trial court, the out-of-pocket expenses and losses and the accounting rules and procedures used by the Company in accordance with the system of accounts prescribed by the Interstate Commerce Commission. (In Conclusion of Law No. 6, the trial court recognized the provisions of 49 U. S. C. A., § 20[5].) The Company's expenses in operating trains 55 and 56 were based on an allocation to this branch line on a train-mileage basis from the total expense of operation of the entire Santa Fe system. The Commission found this unrealistic and seriously discredited the Company's evidence on the expense for the operation of these trains. The Company charges that the findings and order of the Commission on this point of out-of-pocket expenses and losses are an unlawful and unreasonable departure from the law and prior recognition by the Commission of accounting principles and procedure as prescribed by the Interstate Commerce Commission. Be that as it may, the fact remains that on this branch line the revenue derived from passengers using trains 55 and 56 was substantially less than the wages paid to the three crew members employed to operate this train, wholly aside from any and all other operating and overhead expenses.

Another point upon which the Commission differed from the trial court was that of deterioration in service. This involved the change of schedule making the turn-around at Atchison rather than Topeka, Kansas. The Commission ignored the uncontested fact that it would increase expenses by $2,000 per month to operate this train on a Topeka turn-around schedule. (Finding of Fact No. 11.)

Is there public necessity for the operation of Santa Fe's trains 55 and 56? In determining whether a railroad company should be permitted to abandon service presently rendered the public, the paramount factor to be considered is public convenience and necessity. The Commission determined this question adversely to the Company. The principal contention of the Commission on this point is that there is no alternate public passenger service and the Company does not offer a substitute passenger service.

The conclusions of law adopted and applied by the trial court are based solidly on the modern trend of opinion, or philosophy,

that passenger trains are operated primarily for the carriage of passengers, and if the public abandons the trains for passenger travel, there is no duty or obligation to continue their operation at a substantial loss. (Conclusion of Law No. 4.) We do not hesitate to declare that we are in agreement with this position.

Today it is a matter of common knowledge that persons who travel on short trips, that is 200 miles or less, will seldom use the train. The primary reason for this is that automobiles have become a necessity. Good highways supported by tax money, good automobiles and a schedule of one's own choosing lead to the use of an automobile rather than the train. Few of those who so travel know or care if the train operates over the route they intend going; they neither know nor care whether the train coach is modern or not; they are not interested in when the train leaves or when it returns. Most people never even inquire as to such matters. They use their own cars. (*Texas & New Orleans R. Co. v. Railroad Commission*, 220 S. W. 2d 273 [Tex., 1949].) We know of no rule that requires a railroad to maintain the operation of trains at great losses where the need for service no longer exists. To require such operation constitutes one of the forms of economic waste which the Commission was created to eliminate. (*In re Application of Chicago, Burlington & Quincy Railroad Co.*, 152 Neb. 367, 41 N. W. 2d 165.) In 1952 the National Association of Railroad and Utility Commissioners (of which the Kansas Corporation Commission is a member) formed a special committee on co-operation with the Interstate Commerce Commission to study the railroad passenger deficit. The number one recommendation reported by this committee under the heading "What Should Be Done" is:

"1. That the railroads re-evaluate the results of the May, 1951, study of individual deficit passenger trains in the light of changes in mail pay rates and in operating expenses, and that each railroad seek authority from the appropriate commission, or commissions, to discontinue operation of each passenger train which is producing (at current levels or rates, fares and charges) revenues substantially less than the operating expenses (at current levels of wages and prices) reflected in the accounts shown on the summary of the May, 1951, study, attached to this report as Appendix XIX; *and that the regulatory bodies in acting upon such applications should adhere vigorously to the principle that where the service cannot be made compensatory its abandonment should be permitted.*" (Emphasis added.) (p. 52.)

The Company does not base its application to discontinue trains 55 and 56 on financial losses alone. It is also based on the fact that the public has abandoned these trains, and that under the

modern view, there is no need for a railroad company to suffer financial loss where the use of the train has declined to less than five passengers per train mile.

A sound test to follow in cases such as this is whether the expenses which will be eliminated by discontinuance of passenger service have exceeded to such an extent revenue, which will be similarly eliminated, that the resulting net saving to the railroad will further the public good in greater measure than the loss of passenger service will impair it. (*Boston & Maine R. R. v. State,* 97 N. H. 380, 89 A. 2d 764.)

In a proceeding to discontinue certain trains, the revenue, expenses and losses shown in the operation of a train have a direct bearing upon whether or not public convenience and necessity require the continued operation of any particular train. (*St. Louis-San Francisco Railway Company v. State,* 301 P. 2d 228 [Okla., 1956].)

The trial court found upon the record in this case that public convenience and necessity did not require the Company to continue the operation of motor trains 55 and 56 at out-of-pocket losses in excess of $25,000 per year. Upon all the facts and circumstances presented by the record we cannot say as a matter of law that the question was wrongly decided. This was a branch line of less than 50 miles in length upon which the public had abandoned the passenger service.

The third question raised by the Commission, whether the operation of these trains places an undue financial burden upon the Company or whether the refusal of the Commission to authorize discontinuance deprives the Company of its property without due process of law, is closely interwoven with the previous question. Much of what has already been said applies to this point.

The Commission relies on *Chicago, M., St. P. & P. R. Co. v. Illinois,* 355 U. S. 121, 78 S. Ct. 304, 2 L. Ed. 2d 292, which states:

". . . It is of course desirable that each particular intrastate service should as nearly as may be pay its own way and return a profit—but the State Commission, not the ICC, has the responsibility in the first instance to achieve that desired end. Passenger deficits have become chronic in the railroad industry and it has become necessary to make up these deficits from more remunerative services. The ICC has recognized this practical reality of today's railroading and has changed its rate-fixing policy so that if interstate passenger service inevitably and inescapably cannot bear its direct costs and its share of joint or indirect costs, the ICC feels compelled in a general rate case to take the passenger deficit into account in the adjustment of interstate freight

rates and charges. (*King v. United States*, 344 U. S. 254, 261.) An equally broad power must be conceded to a state commission in the exercise of its primary authority to prescribe and adjust intrastate rates." (p. ___.)

The Commission contends that the Company in this case has made no claim that it is operating at a loss or failing to receive a fair rate either on its total investment or upon its investment in the State of Kansas. It relies upon an argument that freight rates have been increased to offset passenger deficits. We observe no merit in this suggestion. If it be true that one of the reasons for allowing increased freight rates was that the Company was compelled to furnish passenger service at a loss, such does not compel the Commission or the court to require a continuance indefinitely of the passenger service after the necessity therefor has been eliminated. If the passenger service becomes unnecessary, the fact that the Company has earnings from freight which might absorb the losses from passenger service is immaterial. (*Safford Chamber of Commerce v. Corporation Com'n*, 81 Ariz. 226, 303 P. 2d 713.)

The federal supreme court has always held that it was the function of regulatory acts to eliminate, not to perpetrate, economic waste. (*Purcell v. United States*, 315 U. S. 381, 62 S. Ct. 709, 86 L. Ed. 910; and see, *State, ex rel., v. Postal Telegraph Co.*, 96 Kan. 298, 150 Pac. 544.)

If the Company could be compelled to continue passenger service on a branch line simply because it was generally prosperous, a railroad would as a result of such logic stand committed to drains upon its income for costly and unnecessary service until complete bankruptcy intervened. (*Public Service Com'n of State of N. Y. v. United States*, 50 F. Supp. 497 [1943]; and see, *Chicago, B. & Q. R. Co. v. Illinois Commerce Commission*, 82 F. Supp. 368 [1949].)

Lest the foregoing statements be misconstrued, we hasten to add that in a proper case evidence of the total net revenue of an entire railroad system may be admitted and considered in the matter of the discontinuance of passenger service, depending on the facts and circumstances of the particular case before the Commission. (See, *Chicago, R. I. & P. Rly. Co. v. State Corporation Commission*, supra; *Boston & Maine R. R. v. State*, supra; and *Alabama Comm'n v. Southern R. Co.*, 341 U. S. 341, 71 S. Ct. 762, 95 L. Ed. 1002.)

We hold that the trial court was justified in finding the order of the Commission unlawful and unreasonable. Regardless of schedule, motor trains 55 and 56 have failed to produce sufficient rev-

enues to meet even the wages of the train crew, where the average number of passengers per train mile is only slightly higher than the number of crew men needed to operate the train. Upon all the facts and circumstances presented by the record in this case, it became the duty of the Commission to grant the Company's application to discontinue the operation of its motor trains 55 and 56 between Atchison, Kansas, and Topeka, Kansas.

The judgment of the trial court is affirmed.

HALL, J., not participating.